UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BILLIE K. HULBERT,

                                    Plaintiff,

          v.                                                6:06-CV-1099
                                                            (LEK/GJD)

COMMISSIONER OF SOCIAL SECURITY,
                                    Defendant.

_____

LISA M. TUMMINELLI, ESQ., Attorney for Plaintiff
ELLEN E. SOVERN, ESQ., Special Assistant U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, United States Magistrate Judge

## REPORT AND RECOMMENDATION

     This matter was referred to me for report and recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18.

## PROCEDURAL HISTORY

     On February 27, 2003, plaintiff filed an application for Disability Insurance

Benefits under Title II and Part A of Title XVIII of the Social Security Act ("Act")

alleging a disability due to diabetes mellitus, numbness in her fingers, chest pains,

bilateral carpal tunnel syndrome, arthritic shoulders and osteopenia in her hips with

an onset date of October 15, 2002.  (Administrative Transcript ("T.") 61, 82, 85, 95,

110, 399, 425).   The Social Security Administration ("Administration") initially denied plaintiff's application, (T. 28), and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (T. 32).   ALJ Thomas P. Zolezzi held a hearing on June 23, 2004, at which plaintiff and her husband testified, and a supplemental hearing on November 4, 2004, at which plaintiff and a vocational expert ("VE") testified.  (T. 18, 358-433).

On December 20, 2004, the ALJ, filed a decision in which he concluded that plaintiff was not disabled.  (T. 18-26).  On December 29, 2004, plaintiff appealed the ALJ's decision to the Appeals Council and during the pendency of her appeal, she submitted additional reports.   (T. 310-37).   The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on July 31, 2006.  (T. 5).   On September 13, 2006, plaintiff filed a complaint seeking judicial review pursuant to 42 U.S.C. § 405(g).  (Dkt. No. 1, Compl.).  Defendant filed the Administrative Transcript on October 24, 2006, (Dkt. No. 4), and filed an answer to plaintiff's complaint on December 12, 2006.  (Dkt. No. 5, Def.'s Answer).

## CONTENTIONS

The plaintiff makes the following claims:

(1) the ALJ failed to consider the severity of plaintiff's bilateral carpal tunnel

syndrome and obesity, (Dkt. No. 9, Pl.'s Br. at 9-12).

(2) the ALJ erred in finding that plaintiff does not meet or equal Listing 9.08, (Dkt. No. 9, Pl.'s Br. at 12-13).

(3) the ALJ erred in his findings regarding Dr. Mika's opinions from his letter dated January 5, 2004, (Dkt. No. 9, Pl.'s Br. at 13-15).

(4) the ALJ erred in giving the opinion of the Administration's doctor, Dr. Murphy, no weight, (Dkt. No. 9, Pl.'s Br. at 15-17).

(5) the ALJ erred in finding that plaintiff's testimony was inconsistent with an inability to work, (Dkt. No. 9, Pl.'s Br. at 17-19).

(6) the ALJ erred in finding that plaintiff could perform light work, (Dkt. No. 9, Pl.'s Br. at 19-20).

(7) the ALJ erred in failing to apply the medical vocational guidelines (the "Grids") for a residual functional capacity ("RFC") for sedentary work, (Dkt. No. 9, Pl.'s Br. at 20-21).

(8) in light of the VE's testimony that plaintiff could not keep a job due to fainting caused by her diabetes, the ALJ erred in finding plaintiff not disabled, (Dkt. No. 9, Pl.'s Br. at 21).

(9) the ALJ erred in his finding regarding plaintiff's transferable skills, (Dkt. No. 9, Pl.'s Br. at 22-23).

(10) the ALJ erred in finding plaintiff capable of work in the national economy based on hypothetical questions posed to the VE that did not include all of plaintiff's restrictions, (Dkt. No. 9, Pl.'s Br. at 23-24).

(11) the evidence of record now requires a finding of disability, (Dkt. No. 9, Pl.'s Br. at 24-25).

Defendant argues that substantial evidence in the record demonstrates that plaintiff's alleged impairments did not prevent her from engaging in substantial gainful activity and that the Commissioner's decision must be affirmed.  (Dkt. Nos. 5, Def.'s Answer at ¶ 7 and 14, Def.'s Br. at 1).

## FACTS

**A.     *Non-Medical Evidence and Testimony***

Plaintiff was born in 1951, (T. 61), and she was fifty-three years old at the time of the ALJ's decision.  (T. 18).  Plaintiff stands five feet five inches tall and weighed approximately 250 pounds at the hearing.  (T. 85, 94, 398).  Plaintiff completed high school.  (T. 91, 101, 362, 398).  Plaintiff's past work experience includes her most recent work teaching a cake decorating class for two to four hours per week, (T. 78, 80, 86, 96, 373), and work as a craft department manager and "key carrier"[1] at a

---

[1]Throughout the record, plaintiff refers to having worked as a key carrier.  During her testimony before the ALJ she explained that a key carrier acted as the store manager in the absence of dedicated store manager.  (T. 372, 401).

department store.  (T. 86, 96, 113, 370-71, 400-01).  As a craft department manager, plaintiff waited on customers, cut fabric, processed orders, stocked supplies, took inventory, handled scheduling and supervised up to four people while as a key carrier she supervised over thirty people.  (T. 370, 402).  Plaintiff's work as a craft department manager required her to lift cartons weighing over 50 or 75 pounds.  (T. 371, 401).  Previously, plaintiff worked as a certified emergency medical technician for fifteen years.  (T. 434).

Plaintiff provided testimony regarding her impairments.  Plaintiff stated work-related stress "would drive [her blood] sugar way low," and that she was not always able to recognize when she was becoming hypoglycemic.  (T. at 95, 109, 123, 409). She testified that when she experienced blood sugar lows during sleep, her husband felt the clamminess of her skin and would try to awaken her to give her glucose tablets.  She testified that when her grandchildren  got in her way, she became "stressed out and . . . will bottom."[2]  (T. 420-21).  Plaintiff testified that she used an insulin pump, which provided insulin intravenously to her all day.  (T. 423).  The

_____

[2]Plaintiff's husband similarly testified that she experienced low blood sugar even with the use of an insulin pump and that her lows would awaken him because she would become cold and clammy.  He testified that their grandchildren's presence at their house caused plaintiff stress and caused low blood sugar.  (T. 429-31).

pump dispensed approximately sixty units of Novolog[3] per day for her diabetes.  (T. 408).  She stated that despite her use of the insulin pump for over four years, she still had problems with low blood sugars.  (T. 411).  Plaintiff also testified that her hips caused her daily discomfort.  (T. 407).

Plaintiff provided statements and testimony, which described and quantified her capacities.  When plaintiff initially applied for disability insurance benefits, she stated that she could lift up to ten pounds, stand up to eight hours and sit up to eight hours.  She further noted no problems climbing stairs, ramps or bending, but stated that kneeling and crawling were uncomfortable for her.  (T. 121).  At her hearing, however, she estimated that she could stand for a couple of hours, sit without restriction–provided that she could periodically switch positions, lift up to eighteen pounds and stated that she could bend, kneel or squat to pick something up from the ground.  (T. 412-13).

Plaintiff's activities of daily living include living in a house with her family in Johnstown, New York, where she did housework, including cleaning, washing dishes, laundry and cooking.  She cooked for her husband, son, and grandchildren and prepared complete Thanksgiving and Christmas dinners.  (T. 104-05).  Plaintiff

---

[3]Novolog is a preparation of insulin aspart, a rapid-acting insulin analogue used in the treatment of diabetes mellitus. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 959, 1312 (31st ed. 2007).

sewed, crocheted, did crafts, read, played on the computer and watched television. (T. 105, 108, 112, 122, 416-17, 19). Plaintiff stated that she went outside at least once a day. (T. 106). Plaintiff no longer drove because the Department of Motor Vehicles suspended her license due to five "diabetes-related" automobile accidents over a two-year period. (T. 95, 107, 123, 262, 266-68, 400, 410). She shopped for groceries weekly and for gifts and clothes as needed. (T. 107). She and her husband went camping in their motor home, and she rode a bicycle. (T. 415-16).

## B.    *VE Testimony*

The VE, Peter Manzi, Ed.D., appeared via telephone at the hearing held on November 4, 2004. He testified that plaintiff's past work as a department and store manager in a retail setting were both skilled jobs. (T. 375-77). The ALJ posed the following hypothetical question in which he asked the VE to assume a fifty-three year old claimant with a twelfth-grade education who was capable of performing light work but was limited such that she could have occasional but not frequent repetitive use of her hands, could not drive for business purposes, and could not be required to climb ladders or stairs or negotiate heights. The ALJ further specified that plaintiff required a low stress job not involving any planning, scheduling, report writing, supervising or high production quotas. The VE testified that based upon these assumptions, the hypothetical claimant could not perform her past relevant work as

a department and store manager.  The ALJ further asked the VE to assume that the hypothetical claimant could not exceed the performance of light work and asked, given these limitations, whether she acquired any skills that would be transferable to other jobs.  (T. 377).  The VE testified that plaintiff had acquired skills "in the data and people work functions . . . ."  (T. 378).

The ALJ asked the VE whether there were any jobs compatible with such skills, and the VE testified that there were sedentary semi-skilled jobs, such as an information clerk–Dictionary of Occupational Titles ("DOT") 237.367-022–for which there were 99,900 such jobs in the national economy and 250 jobs in plaintiff's regional economy.[4]  The VE also testified that plaintiff was capable of performing counter clerk and furniture rental clerk jobs.  (T. 378-81).  The VE further testified that if the hypothetical claimant could only walk for two-and-a-half to three hours in an eight-hour workday, she could still perform the information clerk job.  (T. 382). The VE testified that he did not think that plaintiff would be able to maintain a job without controlling[5] her fainting spells.  (T. 384-85).

---

[4]The VE defined plaintiff's regional economy as the Mohawk region, which consists of Fulton, Herkimer, Montgomery, Oneida, Otsego and Schoharie Counties.  *See* New York State Department of Labor, http://www.labor.state.ny.us/workforceindustrydata/lslma.shtm

[5]The VE testified that if plaintiff's fainting occurred more than once a month, she would not be able to maintain a job.  (T. 383-84)

8

## C.    *Medical Evidence*

### 1.    **Hospital Visits**

In her brief, plaintiff chronicles three visits to hospitals between March 2, 2001, and October 2, 2002.[6]   (Dkt. No. 9, Pl.'s Br. at 2-3).  On March 2, 2001, emergency medical services ("EMS") brought plaintiff to the Saratoga Hospital Emergency Room in Saratoga Springs, New York, after she had passed out at work while pushing a cart.  EMS performed a fingerstick test, which revealed her glucose level was 33.  The attending physician noted plaintiff's previous diabetes mellitus type I diagnosis, determined that plaintiff experienced an acute hypoglycemic episode and discharged her that same day with a glucose level of 212.  (T. 126-128).  On July 15, 2002, the Geneva General Hospital Emergency Room in Geneva, New York, admitted plaintiff complaining of chest pain.  Plaintiff's blood sugar was 556, and the attending physician determined that plaintiff was in diabetic ketoacidosis.  (T. 130-31).  The attending physician referred plaintiff to the Rochester General Hospital Invasive Cardiology–Cardiac Catheterization Laboratory for an angiogram which revealed a normal left ventricle and normal coronary arteries.  (T. 137).  On October 2, 2002, EMS brought plaintiff to the Saratoga Hospital Emergency Room after she

---

[6]Defendant acknowledges that plaintiff had several hospital visits but emphasizes that none occurred during the relevant period and thus disputes their materiality.  (Dkt. No. 14, Def.'s Br. at 5).

9

became unresponsive while at work.  The attending physician noted that on the previous night, plaintiff's blood sugar was 68.  The next morning, however, her blood sugar was between 400 and 435.  At the time of the attending physician's assessment, plaintiff's fingerstick glucose was 162 while a repeat fingerstick showed that her glucose was 166.  (T. 148-49).

### 2.      Champak Patel, M.D.

Plaintiff has treated with Dr. Patel, her primary care physician, every other month for about a year.  He has treated her for arthritis, high cholesterol and osteopenia in her hips.  (T. 155-65, 208-13, 218, 253-58, 270-71 406-07).  In his report dated November 5, 2001, Dr. Patel recorded plaintiff's height and weight and diagnosed her as having diabetes mellitus with obesity, varicose veins, allergic rhinitis and osteoarthritis.  (T. 165).  Dr. Patel referred plaintiff to Gangadhar Madupu, M.D., to perform neurological testing.  (T. 259).  Based upon his testing, Dr. Madupu concluded that plaintiff's results were "consistent with carpal tunnel syndrome involving the motor on the left side and involving sensory fibers on both sides."  (T. 260).

### 3.      Russell N.A. Cecil, M.D., Ph.D.

Plaintiff was examined by Dr. Cecil on August 9, 2002.  He noted that plaintiff complained of numbness, burning and tingling in both hands.  He observed that

neither of plaintiff's hands showed thenar atrophy and that she had full range of motion in her digits. He determined that plaintiff was negative for Tinel's sign[7] and Phalen's sign[8] tests as well as for a median nerve compression test. He further found that plaintiff was negative for Tinel's sign at both the elbow and the cubital tunnel. (T. 261). Dr. Cecil referred plaintiff to Paul W. Salerno, M.D., who on August 15, 2002, performed motor nerve conduction tests, F wave studies, sensory nerve conduction tests and electromyogram testing. Dr. Salerno concluded that there was evidence of bilateral mild/moderate carpel tunnel compression at or near plaintiff's wrists. Dr. Salerno further concluded that there was evidence of very mild right ulnar neuropathy at the elbow without active denervation in the right ulnar innervated forearm and hand muscles. Dr. Salerno found no definitive evidence of a cervical spine radiculopathy without active denervation in the bilateral cervical paraspinal muscles. (T. 264-65). Dr. Cecil again examined plaintiff on October 25, 2002, at which time he observed that she had full range of motion of her digits and that she was mildly positive for Tinel's sign in her right wrist. He observed no thenar atrophy.

---

[7]Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1741 (31st ed. 2007).

[8]Phalen's sign or maneuver is a test used for the detection of carpal tunnel syndrome whereby the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for thirty to sixty seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure for thirty to sixty seconds. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1117 (31st ed. 2007).

(T. 184, 261).

###    4.    Philip J. Mika, M.D.

Plaintiff has treated with Dr. Mika, an endocrinologist, for over ten years.  She saw him every four to six months and his nurse practitioner every other month in between her doctor visits.  (T. 404).  On December 19, 2003, Dr. Mika reported that plaintiff's blood sugars averaged 154.  (T. 221).  On January 5, 2004, Dr. Mika reported that he believed that plaintiff "should be able adequately to meet the responsibilities of a position requiring sedentary work."  (T. 245).  On December 28, 2004, Dr. Mika reported that plaintiff's blood sugars averaged 167 in the morning, 121 before lunch, 127 before dinner and 170 at bedtime.  (T. 323).  On June 2, 2005, Dr. Mika completed a medical source statement in which he opined that plaintiff's impairment did not affect her ability to understand, remember and carry out instructions.  He further opined, however, that her impairment affected her ability to respond appropriately to supervision, co-workers and work-related pressures, but he did not describe the degree of restriction.  With respect to plaintiff's physical abilities, Dr. Mika opined that she could both occasionally and frequently lift up to 25 pounds. He also opined that plaintiff could stand and/or walk for at least two hours in an eight hour workday.  He found that plaintiff's impairment did not, however, affect her ability to sit nor her ability to push and/or pull.  Dr. Mika found that plaintiff could

frequently climb, balance, kneel, crouch, crawl and stoop.  He found that plaintiff's ability to reach, her gross and fine manipulation abilities and her ability to feel were unlimited.   He found no limitations with respect to plaintiff's visual and communicative abilities.   He found that plaintiff's impairment did not cause environmental limitations with respect to temperature, noise, dust, vibration, humidity, hazards or fumes, odors, chemicals or gases.  In conclusion, he opined that plaintiff's problem was that increased stress could trigger hypoglycemia, which after years of diabetes she could not sense, leading to a loss of consciousness.  (T. 312-18).

    **5.**    **Michael A. Mairs, M.D.**

Plaintiff has treated with Dr. Mairs, an ophthalmologist, who examined her eyes and monitored their health in relation to her diabetes.  (T. 407).  During office visits on April 28, 2003, and February 5, 2004, Dr. Mairs examined plaintiff and found no evidence of background diabetic retinopathy in either eye.  (T. 217, 219)

    **6.**    **Consultative Examination with Gowdara Divakara Murthy, M.D.**

The Division of Disability Determinations referred plaintiff to Dr. Murthy who performed a neurological examination on April 23, 2003.  (T. 190).  Dr. Murthy diagnosed plaintiff as having insulin-dependent diabetes mellitus with nephropathy and bilateral carpal tunnel syndrome.  He characterized her prognosis as "slightly poor" with respect to her diabetes and "stable" with respect to her carpal tunnel

syndrome. (T. 193). Dr. Murthy determined that plaintiff's abilities to walk, ascend and descend stairs, push, pull and lift objects were all mildly to moderately limited while her ability to grab objects and feel them with both hands was moderately limited. (T. 193).

### 7.    State Agency Physician

On May 7, 2003, Alan L. Auerbach, M.D., determined that plaintiff did not meet or equal any of the diabetes listings and found no evidence of significant renal failure.  He found evidence of mild carpal tunnel syndrome but concluded that she should be capable of medium work. (T. 194).

### 8.    Additional Evidence Submitted to the Appeals Council

Plaintiff received psychotherapy treatments from Gary Kozick, a licensed clinical social worker,[9] from October 19, 2004, until March 11, 2005.  Plaintiff presented with behavioral and emotional issues that impeded her ability to self-manage her diabetes.  Mr. Kozick found that plaintiff suffered from adjustment disorder with mixed anxiety and depressed mood.  He characterized her stress rating moderate and determined that her global assessment of functioning fell between 51-

---

[9]As a clinical social worker and psychotherapist, Mr. Kozick is not an "acceptable medical source" for purposes of establishing plaintiff's medically determinable impairments." See 20 C.F.R. §§ 404.1513(a)(1)-(5).  In determining the degree of plaintiff's functional limitations, the ALJ may consider evidence from "other sources," which include "public or private social welfare agency personnel."  20 C.F.R. § 404.1513(d)(3); *White v. Comm'r of Soc. Sec.*, 302 F.Supp.2d 170, 176 (W.D.N.Y. 2004).

60, which according to the *Diagnostic and Statistical Manual of Mental Disorders*,

Fourth Edition indicates "moderate symptoms (e.g., flat affect and circumstantial

speech, occasional panic attacks) OR moderate difficulty in social, occupational, or

school functioning (e.g., few friends, conflicts with peers or co-workers)."  Plaintiff

made progress over the course of her treatment with Mr. Kozick such that she had no

complaints of anxiety or depression at her last office visit on March 11, 2005.  (T.

324-336)

### D.   *The ALJ's Decision*

At step one, the ALJ found that plaintiff had not engaged in substantial gainful

activity since the alleged onset of her disability.  At step two, he found that plaintiff's

diabetes mellitus, osteopenia and finger numbness were severe impairments but that

plaintiff's cardiac impairment and carpal tunnel syndrome were not severe

impairments.  He found that none of plaintiff's impairments met or medically equaled

any of the listed impairments in the Regulations.  The ALJ found that plaintiff's

allegations with respect to her limitations were inconsistent with total disability.  The

ALJ found that plaintiff had the ability to engage in a wide range of activities despite

her impairments.  With respect to plaintiff's RFC, he described that she retained the

capacity to perform light work that did not require driving for business.[10]  He also

---

[10]The ALJ described that documentation from the Department of Motor Vehicles, which
noted that they had suspended plaintiff's license for her protection as well as that of other drivers,

15

described that she could occasionally but not frequently use her hands repetitively. He further described found that plaintiff's limitations precluded her from activities that required her to climb ladders and/or stairs or exposed her to unprotected heights. The ALJ concluded that plaintiff required a low stress job that did not demand planning, scheduling, report writing, supervising or high production quotas. The ALJ found that such an RFC allowed plaintiff to perform a significant range of light work. At step four, the ALJ found that plaintiff was unable to perform any of her past relevant work but that she had acquired transferable skills from her previous work. He found that plaintiff was closely approaching advanced age. He found that plaintiff possessed a high school education.

At step five, the ALJ explained that although plaintiff's exertional limitations did not allow her to perform the full range of light work, using Medical-Vocational Rule 202.15 as a framework, he found that there were a significant number of jobs in the national economy that she could perform. Examples of such jobs included work as: (1) an information clerk (DOT 237.367-022), a sedentary semi-skilled position with a specific vocation preparation ("SVP") of four and 99,900 and 250 positions available in the national and regional economies respectively; (2) a counter clerk (DOT 249.366-010) and furniture rental clerk (DOT 295.357-018), unskilled light

---

supported her inability to drive. (T. 22).

positions with an SVP of two and 99,940 and 210 combined positions available in the national and regional economies, respectively.  The ALJ concluded that plaintiff was not under a disability as defined by the Act at any time through the date of his decision.  (T. 25-26).

## DISCUSSION

**A.**   *Disability Standard*

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

**B.   *Scope of Review***

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may

not affirm a decision if it reasonably doubts whether the ALJ applied the proper legal standards, even if substantial evidence appears to support the decision. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258. A

reviewing court, however, cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983).

**C.**   ***Severity of Plaintiff's Carpal Tunnel Syndrome and Obesity***

At Step Two of the evaluation process, a claimant must prove the existence of a severe impairment that significantly limits her physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities). The impairment must be of such severity that not only is the claimant unable to perform her work, but also is unable, considering her age, education, and work experience, to engage in any other kind of substantial work which exists in the national economy. *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of

judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).  The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act."  *Coleman*, 895 F.Supp. at 53.

An ALJ should make a finding of " 'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' "  *Rosario v. Apfel*, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3).  The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps Three through Five must be undertaken.  *Id.* at 1030. Where a claimant alleges multiple impairments, the combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

Plaintiff does not dispute the ALJ's findings that her diabetes and osteopenia were severe, nor does she dispute the ALJ's finding that her cardiac impairment was not severe. (T. 19, 25).  Plaintiff, however, disputes the ALJ's findings that her carpal

tunnel syndrome and obesity were not severe.  (Dkt. No. 9, Pl.'s Br. at 9)

1.      Carpal Tunnel Syndrome

The ALJ noted that plaintiff sought treatment for complaints of numbness and tingling in both of her hands and acknowledged electrophysiological evidence of mild to moderate carpal tunnel type compression at or near the median innervated abductor pollicis brevis muscles of the thumb and very mild right ulnar neuropathy at the elbow without active denervation on the right ulnar. (T. 20).  He noted, however, that plaintiff had no thenar atrophy, that she had full range of motion of her digits and that Tinel's signs and Phalen's signs and median nerve compression tests were all negative.  (T. 20).   Furthermore, the ALJ noted that plaintiff's hand and finger dexterity were intact.   Finally, the ALJ noted that plaintiff had not sought any treatment and that she reported that her carpal tunnel syndrome bothered her only minimally and that she was not interested in any surgical intervention.[11]  (T. 21)

Plaintiff alleges that the ALJ failed to address whether her bilateral carpal tunnel syndrome qualified as a severe impairment under 20 C.F.R. § 404.1520(c). In support of her argument, plaintiff emphasizes the multiple diagnoses of carpal tunnel

---

[11]Plaintiff testified that she was advised to postpone surgery for as long as possible because, given her diabetes, the symptoms were likely to return despite the surgery.  (T. at 406).  As referenced by the ALJ, Dr. Cecil reported on October 25, 2002, however, that plaintiff's carpal tunnel syndrome bothered her rather minimally at that time and that she was simply not interested in any surgical intervention.  (T. 184, 261).

syndrome from Dr. Patel, Dr. Salerno and Dr. Murthy.  Plaintiff argues that even if her bilateral carpal syndrome were not severe, the ALJ must consider all restrictions stemming therefrom in formulating her RFC.  Plaintiff argues that the ALJ failed to include limitations associated with carpal tunnel syndrome–grasping, feeling, pushing and pulling–in formulating her RFC.  Plaintiff thus contends that the ALJ's decision lacks substantial evidence to support the denial of her claim.  (Dkt. No. 9, Pl.'s Br. at 9-11).

Dr. Cecil observed that neither of plaintiff's hands showed thenar atrophy and that she had full range of motion in her digits.  He determined that plaintiff was negative for Tinel's sign and Phalen's sign tests as well as for the median nerve compression test.  Dr. Cecil again treated plaintiff on October 25, 2002, at which time he observed that she had full range of motion of her digits and that she was mildly positive for Tinel's sign in her right wrist.  He observed no thenar atrophy. Moreover, he reported that plaintiff's carpal tunnel syndrome bothered her rather minimally and that she was simply not interested in any surgical intervention at that time. Dr. Mika found that plaintiff's ability to reach, her gross and fine manipulation abilities and her ability to feel were unlimited. Dr. Murthy found neither Tinel's signs nor Phalen's signs.  He determined that plaintiff's ability to grab objects and feel them with both hands was moderately limited and that her carpal tunnel syndrome

was stable.  Furthermore, Dr. Murthy found that with respect to her upper extremities, plaintiff's strength was 5/5 in the proximal and distal muscles, which includes the hands and fingers.  Dr. Auerbach found evidence of mild carpal tunnel syndrome but concluded that plaintiff should be capable of medium work.

The ALJ credited plaintiff's complaints of minimal finger numbness in determining her RFC by specifying that she could only "occasionally, but not frequently, use her hands repetitively."  (T. 21).

The Regulations specify that an "impairment or combination of impairments is not severe if it does not significantly limit [one's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  There is no evidence in the record that plaintiff's carpal tunnel syndrome significantly limited her ability to do basic work activities.  Although the threshold showing required in order to establish the requisite level of severity of Step Two is modest, the medical record supports the ALJ's finding that plaintiff's carpal tunnel syndrome was mild to moderate and did not qualify as a severe impairment.

2.    Obesity

Plaintiff argues that the ALJ's decision lacks substantial evidence because the ALJ failed to consider whether her obesity in combination with her osteopenia, diabetes and other conditions equaled a listing and whether it impacted her RFC.

Plaintiff contends that the ALJ failed to follow the mandate of SSR 02-1p that the ALJ evaluate a claimant's obesity as a medically determinable impairment and evaluate the effects of claimant's obesity alone and in combination with a claimant's other impairments and thus failed to apply the appropriate legal standard. (Dkt. No. 9, Pl.'s Br. at 11-12.) Defendant acknowledges that the ALJ did not directly address plaintiff's obesity but argues that the ALJ considered the entirety of her medical record, which contains no evidence that her obesity significantly limited her ability to perform work-related activities. (Dkt. No. 14, Def.'s Br. at 13-14).

On October 24, 1999, obesity was removed from the list of impairments in 20 C.F.R. pt. 404, subpt. P, app. 1, and thus "[o]besity is not in and of itself a disability." *Guadalupe v. Barnhart*, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing SSR 02-1p). The Administration has made changes to the listings to ensure, however, that the they still address obesity. SSR 02-1p provides that the Administration will consider obesity in determining whether: a claimant has a medically determinable impairment; the claimant's individual impairment(s) is severe; the claimant's impairment(s) meets or equals the requirements of a listed impairment; the claimant's impairment(s) prevents her from doing past relevant work and other work that exists in significant numbers in the national economy. SSR 02-1p. SSR 02-1p provides that a listing is met "if there is an impairment that, in combination with obesity, meets the

requirements of a listing."  SSR 02-1p.  SSR 02-1p provides that obesity is a "
'severe' impairment when, alone or in combination with another medically
determinable physical or mental impairment(s), it significantly limits an individual's
physical or mental ability to do basic work activities."  It further states that

> [w]hen establishing the existence of obesity, we will generally rely
> on the judgment of a physician who has examined the claimant and
> reported his or her appearance and build, as well as weight and
> height.  Thus, in the absence of evidence to the contrary in the case
> record, we will accept a diagnosis of obesity given by a treating
> source or by a consultative examiner.

SSR 02-1P.  The Administration undertakes an "individualized assessment of the
impact of obesity on an individual's functioning when deciding whether the
impairment is severe."  SSR 02-1p.

In her brief plaintiff chronicles her weight from November of 2001 through
January of 2005, during which time her weight fluctuated between 241 and 250
pounds.  Plaintiff argues that her obesity exacerbates her osteopenia-related hip pain.
 Dkt. No. 9, Pl.'s Br. at 11-12.  Consistent with her height and weight, Dr. Patel
diagnosed plaintiff with obesity.[12]  (T. 157, 211, 270-71).

---

[12]"The National Institutes of Health (NIH) established medical criteria for the diagnosis of
obesity in its Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and
Obesity in Adults (NIH Publication No. 98-4083, September 1998).  These guidelines classify
overweight and obesity in adults according to Body Mass Index (BMI)."  SSR 02-1p.  To calculate
one's BMI, divide weight in pounds by height in inches squared and multiply by a conversion factor
of 703.  *See* Centers for Disease Control and Prevention,
http://www.cdc.gov/healthyweight/assessing/bmi/adult_BMI/index.html (site last visited March 4,

SSR 02-1p notwithstanding, "an ALJ is not obligated to single out a claimant's obesity for discussion in all cases." *Yablonski v. Comm'r of Soc. Sec.*, 2008 WL 2157129, at \*6 (N.D.N.Y.  Jan. 31, 2008) (citing *Cruz v. Barnhart*, 2006 WL 1228581, at \*9 (citing *Guadalupe v. Barnhart*, 2005 WL 2033380, at \*6 (S.D.N.Y. Aug.24, 2005))).  Rather, as " '[t]hose circuits which have recently commented on this complaint [that the ALJ did not explicitly consider the claimant's obesity ] have held[,] . . . an ALJ's failure to explicitly address a claimant's obesity does not warrant remand . . . .  When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions.' " *Id.* (quoting *Guadalupe*, 2005 WL 2033380, at \*6 (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005), *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004))) (other citation omitted).

The record makes clear that plaintiff is obese.  Although the ALJ did not expressly address plaintiff's obesity, he considered the physical limitations set forth by the treating physicians taken in conjunction with that from the state agency consultant.  The ALJ's RFC determination indicates that he considered plaintiff's

---

2009).  At five foot, five inches tall and approximately 250 pounds, plaintiff's body mass index is 41.59.  "The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed 'extreme' obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss." SSR 02-1p (emphasis added).

limitations.  While the ALJ's decision did not expressly adopt the physical limitations suggested by the reviewing doctors who found that obesity was not a severe impairment–in some instances the ALJ's RFC determination imposed physical limitations that exceeded those set forth by the treating physicians and in other instances imposed limitations that did not reach those set forth by the treating physicians–the ALJ's failure to specifically address her obesity does not warrant a remand.  *See Martin v. Astrue*, 2008 WL 4186339, at *3-4 (N.D.N.Y. Sept. 9, 2008).  That the ALJ did not expressly address plaintiff's obesity in his decision is not error in this case.[13]

**D.    *Listing of Impairments Section 9.08***

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1520(d) (2003); *Id.* at pt. 404, subpt. P. App. 1 (2003) (listing of *per se* disabling ailments).  Additionally, the regulations state that "if an individual has an impairment

---

[13]Moreover, even assuming *arguendo* that plaintiff's obesity severely limited her physical or mental ability to do basic work activities, there is nothing in the record to suggest that any such limitations would be distinguishable from those attributable to her diabetes, osteopenia or finger numbness, which the ALJ considered and found to be severe.  *Cf. Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience. *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (quoting 20 C.F.R. § 404.1520(d)).

Listing 9.08 provides in part: "Diabetes mellitus With: Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 9.08(A). Listing 11.00(C) defines persistent disorganization of motor function as being

> in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brainstem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P. App. 1, § 11.00(C); *see Frost v. Barnhart*, 2005 WL 757880, at *2 (D.Me. March 14, 2005). Plaintiff argues that her combined diagnoses of diabetes mellitus and carpal tunnel syndrome affecting the use of her fingers and hands equals the Listing of 9.08(A). (Dkt. No. 9, Pl.'s Br. at 13).

The ALJ found that plaintiff's combined impairments neither met nor medically equaled one of the listed impairments. (Tr. 25). Accordingly, even if only by implication, the ALJ also found that plaintiff's diabetes mellitus and carpal tunnel

29

syndrome did not equal Listing 9.08.  Substantial evidence supports the ALJ's determination.  Plaintiff's medical records do not suggest that she suffers from "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station."  *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 9.08(A).  Dr. Mika found that plaintiff's ability to reach, her gross and fine manipulation abilities and her ability to feel were unlimited.  Dr. Murthy determined that plaintiff's ability to grab objects and feel them with both hands was only moderately limited and that her carpal tunnel syndrome was stable.  Dr. Auerbach found that plaintiff did not meet or equal any of the diabetes listings.  Similarly, these diagnoses cannot reasonably be read to establish any of the conditions included in Listing 11.00(C).  Substantial evidence supports the ALJ's finding that plaintiff did not meet or equal Listing 9.08(A).

## E.    *Treating Physician*

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If other substantial evidence contradicts a treating physician's opinion, the ALJ is not required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

The less consistent the treating physician's opinion is with the record as a whole, the less weight it will be given.  *Temple v. Astrue*, 553 F.Supp.2d 271, 278 (W.D.N.Y. 2008) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999), but must properly analyze the reasons that the report is rejected.  *Temple*, 553 F.Supp.2d at 278.

20 C.F.R. §§ 404.1527 and 416.927(e) provide that certain issues are not medical issues regarding the nature and severity of an individual's impairment(s) but rather are administrative findings that are dispositive of a case such that they would direct the determination or decision of disability.  For example, SSR 96-5p notes that an individual's RFC is a determination reserved to the Commissioner.

> [O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

SSR 96-5p.  In evaluating medical source opinions regarding issues reserved to the Commissioner, the adjudicator must apply the applicable factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d): (1) examining relationship; (2) treatment relationship as characterized by the length of the treatment relationship, the frequency of

examination and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. *See* SSR 96-5p; 20 C.F.R. §§ 404.1527(d) and 416.927(d).

In his letter dated January 5, 2004, Dr. Mika opined that plaintiff had

> significant and quite labile diabetes mellitus, requiring insulin, and this has made it very difficult for her to drive safely because of the possibility of drops in her blood sugar, which could impair her ability to drive. Job stresses that she had before, I believe, may well have contributed to a lot of the swings that she had up and down in her blood sugars. Based on my exam of her of December 19, 2003, and reviewing the current state of her diabetic control, I do believe that she could perform more sedentary work, which would minimize the situations in blood sugar that are seen with greater degrees of muscular exertion during work.

(T. 245). The ALJ determined that he could not accord great weight to Dr. Mika's opinion that plaintiff had the ability to perform sedentary work because it is an issue reserved to the Commissioner. (T. 22). In further explaining the weight accorded to Dr. Mika's opinion, the ALJ cited Dr. Mika's office notes from December 17, 2003, in which Dr. Mika indicated that he had a letter from plaintiff's attorney and described that he needed to see her and ask many questions to "prepare the kind of report" that her attorney wanted. (T. 223). Based upon these notes, the ALJ found that Dr. Mika's "opinion may have been based on the claimant's statements. (T. 22).

Plaintiff argues that the ALJ failed to review the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d), which is grounds for reversal. Dkt. No. 9, Pl.'s Br.

at 15.  Indeed, the ALJ neither identified the examining relationship nor properly characterized the nature of the treatment relationship. "Failure to apply the correct legal standards is grounds for reversal." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984); *see Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (explaining that ALJ's analysis was flawed in light of his failure to consider "all of the factors" enumerated in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Ruggiero v. Astrue*, 2008 WL 451 8905, at *16 (N.D.N.Y. Sept. 30, 2008) (Mordue, C.J.) (explaining that the ALJ failed to recite or apply any of the factors set forth in 20 C.F.R. § 404.1527(d)(2) in evaluating claimant's treating physicians and that "[w]ithout the benefit of such analysis, it is impossible to determine whether the ALJ's decision is supported by substantial evidence."); *Schultz v. Astrue*, 2008 WL 728925, at *10 (N.D.N.Y. March 18, 2008) (Mordue, C.J.)  (explaining that ALJ's failure to "recite or apply any of the factors set forth at 20 C.F.R. § 404.1527(d)(2) was legal error). Accordingly, the court recommends that this portion of the ALJ's decision be remanded for further proceedings consistent with this report.

**F.**    ***State Agency Physician***

Plaintiff argues that the ALJ ignored the directive of 20 C.F.R. § 404.1527(a)-(e) to explain the weight given to Dr. Murthy, a one-time consultative neurological examiner. (Dkt. No. 9, Pl.'s Br. at 15-17).

SSR 96-6p emphasizes that findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources by the ALJ.  It further instructs that while ALJs are not bound by the findings made by State agency or other program physicians, the ALJs are not free to ignore the opinions and must explain the weight given to these opinions in their decisions.

To reiterate, Dr. Murthy opined that plaintiff's abilities to walk, ascend and descend stairs, push, pull and lifts objects are all mildly to moderately limited while her ability to grab onto objects and fell them with both hands is moderately limited. (T. 193).  The ALJ found that "great weight cannot be accorded to this opinion as it is vague in nature and does not quantify [plaintiff's] limitations.  However, the [ALJ] has considered the findings set forth in the examination and this is reflected in the above-cited [RFC]."  (T. 22).  Plaintiff disputes the ALJ's justification for not affording great weight to Dr. Murthy as being extraneous to the factors set forth by 20 C.F.R. 404.1527(f) (explaining that in considering the opinions of nonexamining sources, the Administration applies the rules in paragraphs (a) through (e) including factors set forth in paragraph (d): (1) the examining relationship; (2) the treatment relationship as characterized by the length of the treatment relationship, the frequency

of examination and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors). Plaintiff also contends that the ALJ should have contacted Dr. Murthy to clarify the opinion. (Dkt. No. 9, Pl.'s Br. at 15). Citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), defendant submits that the ALJ properly justified the weight he accorded to Dr. Murthy's opinion.[14]

"Unless the treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to . . . any opinions from . . . nontreating sources . . . ." 20 C.F.R. § 404.1527(f)(2)(ii); *Pease v. Astrue*, 5:06-CV-0264, 2008 WL 4371779, at *9 (N.D.N.Y. Sept. 17, 2008) (explaining that the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) apply with equal force to medical opinions rendered by consultative or non-examining physicians). Although the ALJ neither recited nor expressly applied the factors as set forth above with respect to Dr. Murthy, in noting that the Administration referred plaintiff to him for a neurological examination, (T. 20), he at least suggested that Dr. Murthy was a one-time consultative examiner, which indicates nature of the examining relationship and the length, nature and extent of the treatment relationship. *See Smith v. Astrue*, 507

---

[14]In *Curry*, the Court of Appeals explained that a consulting physician's use of the terms "moderate" and "mild," without additional information, were so vague as to render the opinion "useless" to the ALJ as a layperson.

F.Supp.2d 1170, 1180 (D.Kan. 2007) (by stating that physician was a "consulting source," the ALJ suggested that the physician was a "non-treating source"); *cf. Klodzinski v. Astrue*, 2008 274 Fed.Appx. 72, at \*\*1-2 (2d Cir. Apr. 23, 2008) (summary order) (explaining that although ALJ's decision could have been more specific, the court could conclude based on its review of the record that the ALJ applied "the substance" of the treating physician rule). Moreover, it was not error for the ALJ to have assigned less than great weight to Dr. Murthy's opinion in light of the absence of quantified limitations. *See Alexander v. Astrue*, 2008 WL 4445070, at \*5 (N.D.Ga. Sept. 25, 2008) (finding that an ALJ properly assigned of "little weight" to a physician's opinion which failed to quantify the limitations in manner applicable to an assessment of claimant's RFC). Thus, plaintiff's objections to the weight the ALJ assigned to Dr. Murthy's opinion are without merit.

**G.**     *Credibility*

Subjective pain may serve as the basis for establishing disability even absent objective medical evidence. *McLaughlin v. Secretary of Health, Ed. and Welfare*, 612 F.2d 701, 704-05 (2d Cir. 1980) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). To satisfy the substantial evidence rule, the ALJ must base his credibility assessment on a two-step analysis of pertinent evidence in the record. *Gladding v. Commissioner of Social Sec.*, 2008 WL 4104690, at \*8 (N.D.N.Y. Sept.

3, 2008) (citations omitted).  First, the ALJ must consider the claimant's objective medical evidence and determine whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged."   20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, if the ALJ determines that the objective evidence alone does not substantiate the intensity, persistence or limiting effects of the claimant's symptoms, then the ALJ must then must consider additional factors in order to assess that testimony, including: (1) daily activities; (2) location, duration, frequency and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; and (6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

"The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether a claimant's statements about the intensity, persistence, or functionally limiting effects of pain are consistent with the objective medical and other evidence." *Lackey v. Astrue*, 2008 WL 4553062, at *9 (N.D.N.Y. Oct. 6, 2008) (citing SSR 96-7p, 1996 WL 374186, at *2 (SSA 1996)).  "[A] claimant's subjective symptoms must be supported by medical signs or conditions that reasonably could be expected to produce the disability or alleged symptoms based on a consideration of all the evidence." *Pareja v. Barnhart*, 2004

WL 626176, at *10 (S.D.N.Y. 2004) (concluding that despite plaintiff's subjective complaints, the ALJ noted that several physicians determined that plaintiff could do medium work based on her medical records and on their own evaluations of her test results).  An ALJ, however, may not disregard a claimant's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on her ability to work solely because the objective medical evidence does not substantiate them.  SSR 96-7p.  In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the claimant's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms, statements and other information provided by treating or examining physicians regarding the symptoms and how they affect the claimant.  SSR 96-7p.  "One strong indication of the credibility of a claimant's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p, 1996 WL 374186, at *5 (SSA 1996).

The ALJ is "not obliged to accept without question the credibility of such subjective evidence" but rather has the discretion to independently determine a claimant's and other witnesses' credibility regarding the claimant's subjective

complaints of pain "after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility." *Lewis v. Apfel*, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999); *see Marcus*, 615 F.2d at 27; *Mimms v. Heckler*, 750 F.22d 180, 185-86 (2d Cir. 1984); *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  An ALJ who rejects subjective testimony concerning pain or others symptoms "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Melchior v. Apfel*, 15 F.Supp.2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y. 1987) (citation omitted)).

In his decision, the ALJ cited plaintiff's testimony that she was unable to drive after having lost her license.  He cited her testimony that she had ketoacidosis once and that she experienced numbness in her hands at her pinky and ring fingers.  He also cited her testimony that she took over-the-counter Aleve and prescription Accupril and Lipitor.  He cited her testimony that she was able to stand and walk for a couple of hours, but that standing for too long a period of time bothered her foot.  He cited her testimony that she was able to lift and carry 18 pounds.

The ALJ discussed plaintiff's activities of daily living.  He cited her testimony that she had no difficulty shopping or cooking and that she could do the laundry.  He

noted that she has a garden, which she weeded, rode her bike and went camping with her husband. He noted that she sewed and made costumes and that most recently she had worked a couple of hours per week teaching cake decorating classes. He also noted that she used a computer, read and watched television. He further cited her testimony that she has low blood sugars and has to awake during the night to self-administer glucose. The ALJ noted that stress at work led to a blood sugar low and treatment at the hospital. (Tr. 22). He cited her testimony that she had arthritis in her shoulder and osteopenia in the hips. He further cited her testimony that she experienced lows in her blood sugar levels despite her utilization of the insulin pump. (T. 22-23). The ALJ considered plaintiff's daily activities, the location, duration, frequency and intensity of her symptoms, precipitating and aggravating factors thereof, and her medications taken.

Against plaintiff's testimony, the ALJ considered the objective medical evidence in the record and noted that the examination of plaintiff's feet was normal. He also noted that there were no sensory abnormalities. The ALJ noted that plaintiff had not required hospitalization for any diabetes-related illness since October of 2002. (Tr. at 21). The ALJ further noted than although a dual energy X-ray absorptiometry scan taken November 16, 2001, revealed evidence of osteopenia as reported by plaintiff, there was not evidence that she sought follow-up treatment or

required further medical treatment.  The ALJ noted that examinations characterized plaintiff's gait as normal and that she was able to walk on her heels and toes without difficulty.  The ALJ further noted that plaintiff was able to rise from a seated position without difficulty and that straight leg raising tests were negative bilaterally.  The ALJ concluded that plaintiff's statements showed an individual with the ability to engage in a wide range of activities despite her impairments.  (Tr. 23).

Plaintiff contends that the ALJ's determination that her allegations regarding her osteopenia were not credible because she did not seek follow-up treatment is inconsistent with his concurrent determination that her osteopenia was severe. Plaintiff argues that the ALJ failed to evaluate the location, duration, frequency and intensity of her hip pain and thus failed to apply the proper legal standard.  Similarly, with respect to her diabetes mellitus, plaintiff argues that the ALJ concluded that her medical records did not support her alleged symptomatology without considering the factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  Dkt. No. 9, Pl.'s Br. at 17-19.

Defendant argues that plaintiff's activities of daily living and her assessment that her ability to sit was unlimited, that she could stand for at least a couple of hours a day and that she could lift up to eighteen pounds supports the ALJ's findings.  Dkt. No. 14, Def.'s Br. at 17.

When set against the ALJ's determination that plaintiff's osteopenia was severe, the ALJ's determination that plaintiff's allegations regarding her osteopenia were not credible because she did not seek follow-up treatment might, at first blush, appear inconsistent.  The determinations, however, are not irreconcilable: the ALJ found plaintiff's osteopenia to be severe within the meaning of the Regulations but not as severe as plaintiff alleges.  A finding that an impairment is severe does not automatically trigger a finding of disabled nor does it necessarily imbue a claimant's allegations with credibility.  It is undisputed that an ALJ may consider a claimant's conservative course of treatment when assessing credibility.  *See, e.g.*, *Harvey v. Astrue*, 2008 WL 4517809, at *13 (N.D.N.Y. Sept. 24, 2008).  While the ALJ's recitation of the factors leading him to reject, in part, plaintiff's subjective claims is less than comprehensive, it nonetheless sets forth in summary fashion the basis for his determination, which draws the support of substantial evidence.  Having reviewed the record, this court is satisfied that the ALJ applied the proper legal standards in his analysis of plaintiff's complaints of pain and that there is substantial evidence in the record to support the ALJ's decision to discredit plaintiff's testimony regarding disabling pain.

**H.    *RFC Determination***

Plaintiff claims that in determining that she could perform light work, the ALJ

set his own expertise against that of both Dr. Murthy, who noted a mild to moderate limitation of her walking, and Dr. Mika, who noted that she could perform only sedentary work in reports dated January 5, 2004, and June 2, 2005, and who noted on June 20, 2005, that she could stand and/or walk for two out of six hours.  Plaintiff argues that the ALJ had no medical opinion to support his determination that she was able to perform light work.  (Dkt. No. 9, Pl.'s Br. at 20).

Defendant submits that the ALJ considered Dr. Mika's opinion that plaintiff's diabetes made it difficult for her drive and his opinion that work stressors may have contributed to the lability of her blood sugar level when in his RFC determination he precluded plaintiff from work activities involving driving and limited plaintiff to low-stress jobs.  Defendant also submits that the ALJ considered Dr. Murthy's opinion with respect to plaintiff's ability to walk, ascend and descend stairs, push, pull and lift objects, and her ability to grasp and feel objects.  (Dkt. No. 14, Def.'s Br. at 19). Defendant further submits that the ALJ considered the opinion of Dr. Auerbach who determined that plaintiff could perform medium work.  Finding Dr. Auerbach's assessment too permissive, the ALJ did not accord great weight to his opinion.  (Dkt. No. 14, Def.'s Br. at 19-20).

The ALJ's finding that plaintiff could perform light work such that she could stand, walk and sit for six hours in an eight hour workday and that did not require

driving is not completely devoid of supporting medical evidence as plaintiff suggests. Dr. Auerbach's opinion that plaintiff could perform medium work[15] also supports a finding that plaintiff could perform light and sedentary work.  *See* 20 C.F.R. § 404.1567(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work.").  In the RFC determination, the ALJ also drew upon Dr. Mika's opinion that job stressors may have contributed to plaintiff's blood sugar lability.  Furthermore, in finding that plaintiff was precluded from activities that required climbing ladders and stairs, the ALJ incorporated elements of Dr. Murthy's opinion that plaintiff's ability to ascend and descend stairs was  mildly to moderately limited.  The ALJ properly determined that plaintiff had the RFC to perform light work with certain physical restrictions and his RFC determination is supported by substantial evidence.

## I.    *Failure to Apply the Grids for RFC for Sedentary Work*

The ALJ found that plaintiff was an individual closely approaching advanced age, with a high school education and transferable skills from previously performed skilled work such as recording information, writing reports, managing, supervising a department, and dealing with customers.  The ALJ relied upon the Grids, Rule 202.15 as a framework for decision-making and found a significant number of jobs

---

[15]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).

in the national economy that plaintiff was capable of performing.

At the time of the hearing, plaintiff was fifty-three years old with a high school education with work experience as a crafts department manager in a department store and as a cake decorator.  Plaintiff's cake decorating was a part-time endeavor she engaged in two to four hours per week and from which she made no more than $800 per month.  Plaintiff contends that the ALJ should have applied the Grids to these factors–age between fifty and fifty-two, high school graduate with unskilled work or with non-transferable skilled work–which would have resulted in a finding of disabled.  (Dkt. No. 9, Pl.'s Br. at 21).  Under the Grids, these specifications would trigger either Rule 201.12 (specifying age as closely approaching advanced age, education as high school graduate or more–does not provide for direct entry into skilled work, previous work experience as unskilled or none and directing a finding of disabled) or Rule 201.14 (specifying age as closely approaching advanced age, education as high school graduate or more–does not provide for direct entry into skilled work, previous work experience as skilled or semiskilled–skills not transferable, and directing a finding of disabled).  20 C.F.R. Part 404, Subpart P, App. 2.

Defendant argues that even if plaintiff's RFC were for sedentary as opposed to light work, the Grids would direct a finding of not disabled.  (Dkt. No. 14, Def.'s

Br. at 21); *see* 20 C.F.R. Part 404, Subpart P, App. 2, Rule 201.15 (specifying age as closely approaching advanced age, education as high school graduate or more–does not provide for direct entry into skilled work, and previous work experience as skilled or semiskilled–<u>skills transferable</u> and directing a finding of not disabled).

The parties dispute whether plaintiff's job skills were transferable. Plaintiff argues that the ALJ mis-characterized her record keeping, people, customer service, report, data and people work function abilities as skills and that they are properly considered work traits.  Plaintiff further contends that even if such traits were more properly regarded as skills, the ALJ failed to properly analyze their transferability as they related to the jobs for which the VE found she was suited.  (Dkt. No. 9, Pl.'s Br. at 22-23).  To the contrary, defendant maintains that the VE identified transferable skills not traits.  (Dkt. No. 14, Def.'s Br. at 21, n. 9).  Defendant asserts that the information clerk job the VE identified as a job plaintiff could perform required a lesser degree of skill, involved neither tools nor machines and involved the same or similar processes and services, *i.e.*, dealing with customer inquiries.  With respect to the other two jobs–counter clerk and photo finisher–identified by the VE as work plaintiff could perform, defendant concedes that a claimant cannot transfer skills to unskilled work such as those positions and that the ALJ erred in finding that those jobs constituted other work that plaintiff could perform.  Defendant argues, however,

that the error was harmless in light of the information clerk position's suitability, which existed in significant numbers in the national economy.  (Dkt. No. 14, Def.'s Br. at 22, n 10).

> A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn).  It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner.  This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery.  A skill gives a person a special advantage over unskilled workers in the labor market.

SSR 82-41.  SSR 82-41 refers to the Regulations' definition of semiskilled work in Sections 404.1568(b) and 416.968(b), which state that semiskilled jobs "may require alertness and close attention . . . coordination and dexterity . . . as when hands or feet must be moved quickly to do repetitive tasks."  SSR 82-41.

> These descriptive terms are not intended, however, to illustrate types of skills, in and of themselves.  The terms describe worker traits (aptitudes or abilities) rather than acquired work skills.  Skills refer to experience and demonstrated proficiency with work activities in particular tasks or jobs. In evaluating the skill level of [past relevant work] or potential occupations, work activities are the determining factors . . . . It is the acquired capacity to perform the work activities with facility (rather than the traits themselves) that gives rise to potentially transferable skills.

SSR 82-41.  The Second Circuit has concluded that there is an inherent difference

47

between aptitudes and skills and cited with approval the Sixth Circuit's observation that while "an aptitude is an innate ability," "a skill is a learned ability." *Draegert v. Barnhart*, 311 F.3d 468, 475 (2d Cir. 2002) (quoting *Weaver v. Secretary of Health and Human Servs.*, 722 F.2d 310, 311-12 (6th Cir. 1983)). In *Draegert*, the Second Circuit cited with approval the Sixth Circuit's conclusion that the capacity to exercise " 'independent judgment' " and the ability to exercise " 'responsibility for a work product' " were too vague to qualify as transferable skills. *Id.* at 475 (citing *Ellington v. Secretary of Health and Human Services*, 738 F.2d 159, 159-61 (6th Cir. 1984)). The *Dragert* court concluded that a claimant's so-called skills–the ability to learn and apply rules and procedures, which are sometimes hard to understand, the ability to use reason and judgment in dealing with all kinds of people, the ability to think clearly and react quickly in an emergency, the ability to keep physically fit, the ability to make conclusions based on facts and on one's personal judgment, and the ability to change easily and frequently from one activity to another–"when not linked to any particular tasks, [we]re merely traits or aptitudes, not job skills . . . ." 311 F.3d at 476.

SSR 82-41 also addresses how to generally determine transferability:

Where transferability is at issue, it is most probable and meaningful among jobs in which: (1) the same or a lesser degree of skill is required, because people are not expected to do more complex jobs than they have actually performed (i.e., from a skilled to a semiskilled or another skilled job, or from one semiskilled to another semiskilled job); (2) the same or similar tools and machines

48

are used; and (3) the same or similar raw materials, products, processes or services are involved. A complete similarity of all these factors is not necessary. There are degrees of transferability ranging from very close similarities to remote and incidental similarities among jobs.

SSR 82-41. The regulations describe transferability as follows:

(1) What we mean by transferable skills. We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in the past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

(2) How we determine skills that can be transferred to other jobs. Transferability is mot probable and meaningful among jobs in which--

(I) the same or a lesser degree of skill is required;
(ii) The same or similar tools and machines are used; and
(iii) The same or similar raw materials, products, processes, or services are involved.

(3) Degrees of transferability. There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable.

20 C.F.R. § 404.1568(d)(1)-(3).

The court will thus consider whether the record supports the ALJ's finding that

plaintiff's abilities–identified by the ALJ and VE as record keeping, people, customer

service, report and data and people work function–are skills or merely traits.  The court also notes plaintiff's testimony that, *inter alia*, she waited on customers, took inventory, handled scheduling and supervised up to four people while as a key carrier she supervised over thirty people.  (T. 370, 402).  The court's research did not disclose any cases originating in the Second Circuit that discussed whether the abilities identified by the VE qualified as skills or merely traits.  Other courts, however, have identified "record keeping," "customer service" and "people skills" as transferable skills.  *See Burton v. Secretary of Health and Human Servs.*, 893 F.2d 821, 823 (6th Cir. 1990) (explaining that claimant had acquired transferable skills including customer service and inventory functions); *Ingle v. Heckler*, 763 F.2d 169, 170 (4th Cir. 1985) (affirming district court's finding that abilities identified by vocational expert, including record keeping, "were skills that the Secretary could find to be transferable to other work"); *Harris v. Astrue*, 2009 WL 210470, at *12 (N.D.Ill Jan. 26, 2009) (explaining that claimant's "people skills" could be properly classified as transferable work skill that could be acquired through work performed in a supervisory role).  The court finds that the evidence of record supports the ALJ's determination that plaintiff acquired transferable skills during the course of her work as a department manager.

**J.**   *VE Testimony*

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a VE.  20 C.F.R. §§ 404.1566, 416.966.  A VE may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Here, upon questioning by plaintiff's attorney, the VE testified that plaintiff's diabetes-induced fainting spells would have to be under control, and that if they were not, "it would make it impossible for her to keep a job." (T. 384).  Plaintiff argues that her diabetes standing alone demonstrates that she is incapable of sustaining work in the national economy.  (Dkt. No. 9, Pl.'s Br. at 21).  Defendant acknowledges the VE's opinion but notes that the ALJ need not accept the VE's opinion in response to a hypothetical question based upon symptoms and limitations which the ALJ has reasonably rejected.  (Dkt. No. 14, Def.'s Br. at 23-24 n.11).  Indeed, the "ALJ is responsible for determining, based on all the evidence, the claimant's physical capabilities." *Dumas*, 712 F.2d at 1554 n.4 (explaining that because the ALJ had discounted the claimant's assessment of the severity of his impairment, the ALJ was

51

entitled to rely upon the VE's prior opinion that the claimant possessed the skills necessary to perform certain work).  Furthermore, the record reveals that plaintiff fainted twice while at work: on the first occasion, plaintiff had doubled her dosage of insulin to compensate for a hectic pace at work ; on the second occasion, she was not using her broken insulin pump and self-administered too much insulin.  (T. 128, 148).  Dr. Mika concluded that with plaintiff's current diabetic control, she was capable of performing sedentary work.  (T. 245, 315-18, 382).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F.Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion." *Dumas*, 712 F.2d at 1554.

Plaintiff argues that the hypothetical questions posed by the ALJ to the VE did not include all of the restrictions noted by both the consultative examiner and her treating physicians, specifically Dr. Murthy's restrictions for pushing, pulling and moderate limitation with respect to grabbing and feeling objects and Dr. Mika's

restriction to sedentary work.  Plaintiff further argues that the ALJ failed to incorporate plaintiff's carpal tunnel syndrome and obesity and thus failed to address any associated restrictions.  By failing to submit an accurate RFC for the hypothetical questions, plaintiff contends that defendant has not met his burden pursuant to SSR 96-8p. (Dkt. No. 9, Pl.'s Br. at 23-24).  Plaintiff argues that regardless of whether she may be capable of performing work for a limited duration, *i.e.*,uninterrupted by a diabetic episode, she is not capable of sustaining work over a period of time due to lack of diabetic control.  Defendant asserts that plaintiff is capable of sustaining work.

With the assistance of a VE, the ALJ found that although plaintiff could not perform her past relevant work, she could perform certain light work such as an information clerk, counter clerk and furniture rental clerk.  (T. 24-26).  To reiterate, the ALJ asked the VE to assume a hypothetical claimant, fifty-three years of age, possessed of a twelfth-grade education and capable of performing light work with the following non-exertional limitations: she can have occasional, but not frequent repetitive use of her hands; there must be no driving for any business purposes; her work must not require her to climb any ladders, stairs, or negotiate any heights; her work must be low stress requiring neither planning, scheduling, report writing, supervising nor high production quotas. (T. 377).  The hypothetical question posed by the ALJ to the VE accurately reflected plaintiff's age, education, and RFC and

presented the full extent of plaintiff's impairments.  Plaintiff's argument is without merit.

### K.    *New Evidence Before the Appeals Council*

Plaintiff contends that the evidence she submitted post-decision to the Appeals Council requires a finding of disability.  Plaintiff cites Dr. Mika's opinion that she was only capable of performing sedentary work, (T. 315-318), and his notes that she continued to experience blood sugar lows, left shoulder and hip pain from osteopenia. (T. 321-22).  Plaintiff cites Dr. Mika's RFC assessment in which he opined that plaintiff's impairment affected her ability to stand and/or walk such that she could stand and/or walk for at least two hours in an eight hour workday, that increased stress could trigger hypoglycemia, which after years of diabetes she could not sense, leading to a loss of consciousness affecting her ability to respond appropriately to supervision, co-workers and work-related pressures. (Dkt. No. 9, Pl.'s Br. at 24-25).

Defendant notes, however, that most of the evidence plaintiff submitted post-dates the relevant period.  Furthermore, defendant argues that at least part of the new evidence, specifically Dr. Mika's medical assessment, serves to only bolster the ALJ's determination that plaintiff was capable of performing the job of information clerk. (Dkt. No. 14, Def.'s Br. at 24-25).  Indeed, Dr. Mika's medical assessment can be fairly read as lending support to the ALJ's determination that plaintiff could

perform the job of information clerk.[16]  In light of the court's recommendation that the case be remanded for further consideration of the weight assigned to Dr. Mika's opinion, the court similarly recommends that the ALJ examine the new evidence submitted to the Appeals Council post-decision.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the decision of the Commissioner be **REVERSED,** and this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the above Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

---

[16]The information clerk position is sedentary and semi-skilled.  The VE testified that a person of plaintiff's age and with plaintiff's education and past relevant work experience who could walk for only two and a half to three hours could still perform the information clerk job. (T. 382).  In June of 2005, Dr. Mika opined that plaintiff could stand and/or walk for at least two hours in an eight hour workday and that her impairments did not affect her ability to sit.  (T. 315, 316).  Furthermore, earlier, in January of 2004, Dr. Mika had opined that plaintiff could perform sedentary work.  (T. 245).

**DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Servs.*, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a).

Date: August 6, 2009

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge